**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MARY K. CURTIS, | CASE NO. 5:22-CV-02028 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| SUMMIT COUNTY CHILDREN SERVICES, *et al.*, | <u>**MEMORANDUM OPINION & ORDER**</u> |
| Defendants. | |

Before the Court is the County of Summit's Motion for Judgment on the Pleadings.

(ECF Doc. 17 ("Motion").)  The Motion is fully briefed and ripe for decision.  (ECF Docs. 22,

23.) The parties have consented to the magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed.

R. Civ. P. 73.  (ECF Doc. 16.)  For the reasons set forth below, the Court **GRANTS** the Motion,

dismisses Plaintiff's claims against the County of Summit, and **DENIES** Plaintiff's request for

leave to file an amended complaint.

## I.      Background

Plaintiff Mary K. Curtis ("Plaintiff" or "Ms. Curtis") filed the present Complaint against

defendants Summit County Children Services ("SCCS") and County of Summit ("the County")

(collectively "Defendants") on November 9, 2022, seeking to remedy alleged statutory violations

and discrimination relating to her request for "a religious accommodation from Defendants'

mandate that she wear a mask while working."  (ECF Doc. 1 ("Complaint"), p. 1, ¶ 1.)  She

1

asserts that "Defendants statutory violations, discrimination, and retaliation left [her] with the choice of wearing a mask in violation of her sincerely held religious beliefs or losing her job." (*Id*. at p. 2, ¶ 4.)  The more specific allegations of her Complaint are set forth below.

## A.    Factual Background

### 1.    Alleged Relationship Between the County, SCCS, and Ms. Curtis

The County has a charter form of government and manages "over ten (10) departments in addition to overseeing various agencies and divisions, including SCCS."  (Complaint, p. 2, ¶ 9.) SCCS is variously identified as a "Summit County agency," "the County of Summit's local child welfare agency," and "an agency/division of" the County.  (*Id*. at p. 2-3, ¶¶ 7-8, 13.)  More specifically, SCCS is alleged to be a child welfare agency that works with abused and neglected children and their families, and which is "mandated to assess and investigate reports involving the safety and well-being of children."  (*Id*. at p. 2, ¶¶ 7-8.)  The County "maintains oversight authority and job postings on its website for all open positions at SCCS."  (*Id*. at p. 3, ¶ 14.)

Ms. Curtis worked as a Social Worker Assistant / Social Service Aide in the Community Visit Unit at SCCS, where she supervised community court ordered visitations of abused and neglected children within their homes, in the community, and at the SCCS building.  (Complaint, p. 2, ¶ 7.)  Ms. Curtis started employment at SCCS in September 2007 and worked there for over fourteen years.  (*Id*. at p. 3, ¶ 10.)  SCCS was Ms. Curtis' "direct employer."  (*Id*. at p. 3, ¶ 13.) Although it is not alleged in the Complaint, Ms. Curtis asserts that the Summit County Fiscal Officer issued her paychecks and is listed on her W-2 as her employer.  (ECF Doc. 22, pp. 1-2.)

### 2.    COVID-19 Mask Mandates

Starting in July 2020, in response to a rise of COVID-19 infections, the State of Ohio issued Ohio Department of Health Orders requiring the wearing of facial coverings.  (Complaint,

pp. 3-4, ¶¶ 16-18.)  On July 27, 2020, SCCS required all SCCS staff to wear a face covering while conducting SCCS business or on SCCS premises.  (*Id*. at p. 4, ¶ 19.)  This policy "did not provide for any medical or religious exemption to the mask mandate and provided no instructions as to how employees could request an exemption as required under EEOC guidelines." (*Id*.)  SCCS then implemented a written policy on August 3, 2020, entitled "*COVID-19 Response Plan Family Interaction & Child Transportation Guidelines*," which required "staff to wear face coverings at all times during their participation in family interactions and while transporting children." (*Id*. at p. 4, ¶ 20.)  Again, "[n]o instructions for requesting religious or medical exemptions were provided." (*Id.*)

On August 28, 2020, Summit County health officials issued their own mask mandate, which required the wearing of masks or face coverings in most public places, and also required businesses to enforce the mandate on their employees and customers.  (Complaint, p. 4, ¶ 21.) The County's policy permitted exemptions where "the wearing of a mask 'substantially burdens the practice of a sincerely held religious belief.'" (*Id*.)

The County temporarily lifted its mask mandate when the State of Ohio rescinded its own mask mandate on June 20, 2021.  (Complaint, p. 5, ¶ 22.)  However, upon information and belief, Ms. Curtis alleges the County reinstituted its mask mandate "when COVID-19 cases rose beyond a certain level." (*Id*.)  On August 9, 2021, following a "period of no masking for several months," staff at SCCS were instructed to return to mask wearing.  (*Id*. at p. 5, ¶ 23.)

 "SCCS provided no method or system by which employees could request accommodation to its mask mandate." (Complaint, p. 6, ¶ 30.)  "SCCS did not prohibit employees from applying for a religious exemption to the masking mandate," but "provided no instruction as to how an employee might request for religious or medical exemption on their own

initiative" and "[e]mployees seeking exemption from the mask mandate had to figure it out on their own with no direction or assistance from SCCS."  (*Id*. at p. 7, ¶¶31-32.)

### 3.    Challenged Employment Actions

On September 14, 2021, Ms. Curtis submitted a notarized "religious accommodation request" to SCCS, requesting relief from its mask mandate because "her sincerely held religious beliefs prevented her from wearing a mask or any form of facial covering."  (Complaint, p. 7, ¶ 33.)  After submitting the request, she "was sent home and forced to take Paid Time Off ("PTO") until her request was resolved."  (*Id*. at p. 7, ¶ 35.)

The next day, the SCCS Deputy Executive Director for Human Resources & Support Services, Valerie Nash, "called for a hearing to discuss Plaintiff's request for an exemption." (Complaint, p. 7, ¶ 36.)  At the hearing, Ms. Curtis "spoke of her deeply held religious convictions" and stated that "[w]earing a mask evidences a lack of faith and trust in God to protect her."  (*Id*.)  Ms. Curtis "offered to complete periodic COVID-19 testing . . . as a reasonable accommodation."  (*Id*.)  In response, SCCS offered Ms. Curtis "a lower paid position that still required wearing a mask/face shield."  (*Id*. at p. 8, ¶ 37.)  Further, instead of seeking an interactive discussion of her accommodation request, SCCS allegedly said Ms. Curtis "would have to wear a mask or resign" and instructed her to use PTO until the matter was resolved.  (*Id*.)

On September 20, 2021, Ms. Nash told Ms. Curtis via email that her exemption request was denied.  (Complaint, p. 8, ¶ 38.)  Ms. Nash wrote that Ms. Curtis' beliefs were not sincerely held religious beliefs protected by law, and that SCCS would deny the religious accommodation even if her beliefs were sincere "because of undue hardship due to the 'threat' of spreading COVID by not wearing a mask."  (*Id*.)  Ms. Nash also ordered Ms. Curtis to return to work the next day wearing a mask, and said SCCS would consider her to have resigned if she did not do

4

so.  (*Id*.)  The same day, Ms. Curtis responded via email that "she would not wear a facial covering/mask due to her sincerely held religious beliefs and would not accept a voluntary resignation under any circumstances."  (*Id*. at p. 8, ¶ 39.)  Due to Ms. Curtis' refusal to return to work wearing a mask, Ms. Nash informed Ms. Curtis via email on September 22, 2021 that a meeting would be held with her on October 13, 2021.  (*Id.* at p. 8, ¶ 40.)

SCCS held a disciplinary meeting with Ms. Curtis on October 13, 2021.  (Complaint, p. 8, ¶ 41.)  At that meeting, Ms. Nash inquired about Ms. Curtis' professional counseling licensure and referenced counseling ethics "even though Plaintiff never worked in that capacity for SCCS."  (*Id*. at p. 8, ¶ 41.)  Ms. Nash's inquiry and discussion of counseling ethics caused Ms. Curtis to be concerned that Ms. Nash "was threatening her professional counseling license due to her religious beliefs."  (*Id*.)  Ms. Nash also allegedly instructed Ms. Curtis to read and explain how each COVID-19 protocol, including those unrelated to the mask mandate, "went against her religious beliefs."  (*Id*. at pp. 8-9, ¶ 41.)  As a result, Ms. Curtis felt "threatened and demeaned for her faith."  (*Id*. at p. 9, ¶ 41.)

On October 22, 2021, SCCS met with Ms. Curtis "to communicate the disposition of the charges against her."  (Complaint, p. 9, ¶ 42.)  Ms. Curtis was terminated on November 1, 2021.  (*Id*. at p. 9, ¶ 43.)  Ms. Curtis timely filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").  (*Id.* at p. 9, ¶ 44.)  The EEOC issued a Notice of Right to Sue on August 11, 2022.  (*Id*. at p. 9, ¶ 45.)

## B.    Procedural History

Ms. Curtis filed the present Complaint on November 9, 2022, asserting the following claims for relief against both Defendants: (1) Religious Discrimination-Failure to Accommodate in violation of Title VII, 42 U.S.C. § 2000e, *et seq*.; (2) Religious Discrimination-Retaliation in

violation of Title VII, 42 U.S.C. § 2000e, *et seq*.; and (3) violation of the Religious Freedom Restoration Act ("RFRA") (42 U.S.C. §2000BB-1).  (Complaint, pp. 9-12, ¶¶ 46-68.)

In support of the Title VII failure to accommodate claim in Count I, Ms. Curtis alleges she informed SCCS that her sincere religious beliefs precluded her from wearing a mask or facial covering and requested accommodation from the masking mandate, but that "SCCS denied [her] request for religious accommodation on masking" and "did not engage in an interactive process . . . regarding her request for religious accommodation."  (*Id.* at p. 9, ¶¶ 47-50.)  She also asserts generally that "Defendants" responded to her attempts at resolution with a blanket denial, ignored mitigating factors, did not provide reasonable accommodations, discriminated against her, and caused her harm as a result.  (*Id.* at pp. 9-10, ¶¶ 50-53.)

In support of the Title VII retaliation claim in Count II, Ms. Curtis alleges that she engaged in protected activity when she requested religious accommodations from SCCS's masking mandate and complained to management about the discriminatory behavior of SCCS staff in response to her religious objections to the masking mandate.  (Complaint, p. 10, ¶ 56.) She then asserts generally that "Defendants" responded to her protected activity by giving her a false choice between masking and effective termination, did not engage in an interactive process, and never intended to provide an accommodation.  (*Id.* at p. 10, ¶¶ 57-58.)  She asserts that her religious beliefs and protected activity were the causes of "Defendants' adverse employment action," and that "Defendants" discriminatory and disparate treatment of her accommodation request reflected their hostility to requests for religious accommodation.  (*Id.* at p. 10, ¶¶ 58-59.)

In support of the RFRA claim in Count III, Ms. Curtis alleges "Defendants' actions" in failing to engage in a dialogue regarding accommodations, in refusing to accommodate her, and in terminating her imposed a substantial burden on her exercise of religion.  (*Id.* at p. 11, ¶ 65.)

6

The County filed this Motion on January 30, 2023, seeking judgment on the pleadings because Ms. Curtis "accuses only SCCS of forcing her to take time off, holding a hearing regarding her request for accommodation, refusing her request, then terminating her in violation of her civil rights." (ECF Doc. 17, p. 8.) The County argues it cannot legally exercise control over SCCS employees, it is not Ms. Curtis' employer, and the Complaint lacks sufficient factual detail to state a claim against the County as a "joint employer." (ECF Docs. 17, 23.)

Plaintiff argues in response that "it is premature to determine at the pleading stage that there is insufficient relationship between SCCS, a County agency, and the County to dismiss the County as a party." (ECF Doc. 22, p. 4.) She contends that she has alleged "sufficient interrelationship between the County and SCCS for the County to remain a party." (*Id*.) Alternately, in the event that the Court grants the Motion, Ms. Curtis "requests leave to amend her Complaint to assert that her paychecks are issued by the Summit County Fiscal Officer and that her employer is listed as the Summit County Fiscal Officer on her W-2." (*Id*. at p. 6.)

## II.     Standard of Review

"The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001) (internal citations omitted)). Under Rule 12(b)(6), the Court may dismiss a claim when a party fails to plead facts on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The plaintiff is not required to include "detailed factual allegations," but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citation omitted).

This Court "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (citation omitted).  However, while "we must accept all well-pleaded factual allegations in the complaint as true, we need not 'accept as true a legal conclusion couched as a factual allegation.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555, quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### III.     Discussion

### A.     Whether Allegations of Complaint State Claims for Relief Against the County

The Complaint contains detailed allegations regarding both Ms. Curtis' employment with SCCS and the challenged conduct of SCCS and its representatives.  (*See, e.g.,* Complaint, pp. 3, 6-9, ¶¶ 10, 12-13, 15, 30-31, 33-34, 36-38, 41-42.)  In comparison, the allegations regarding the County are generalized and vague.  Ms. Curtis alleges that SCCS is a child welfare agency over which the County "maintains oversight authority and job postings on its website" (*id.* at pp. 2-3, ¶¶ 7-9, 13-14), that the County had its own mask mandate, separate from SCCS's, which allowed religious exemptions (*id.* at pp. 4-5, ¶ 21), and that the County temporarily lifted its mask mandate after June 20, 2021, but later reinstituted it when COVID-19 cases rose (*id.* at p. 5, ¶ 22).

While Plaintiff refers specifically to SCCS in describing the discriminatory and retaliatory conduct underlying her Complaint (*id.* at pp. 7-10, ¶¶ 33-43, 48-50, 56), she makes only general allegations against "Defendants" collectively when alleging conduct involving the

County (*id.* at pp. 9-12, ¶¶ 50-54, 57-61, 64-67).  Nevertheless, she argues "Defendants" are

jointly liable for (1) failing to provide religious accommodations under Title VII (*id.* at pp. 9-10,

¶¶ 50-53), (2) retaliating in response to the request for religious accommodations under Title VII

(*id.* at p. 10, ¶¶ 57-59), and (3) imposing a substantial burden on Plaintiff's exercise of religion

under RFRA by refusing her religious accommodations and terminating her (*id.* at p. 11, ¶ 65).

Title VII makes it unlawful for an "employer" to discharge or otherwise discriminate

against a person with respect to her employment because of her "race, color, religion, sex, or

national origin . . ." 42 U.S.C. § 2000e-2(a).  RFRA makes it unlawful for the government to

"substantially burden a person's exercise of religion even if the burden results from a rule of

general applicability," subject to certain exceptions.  *Doster v. Kendall*, 596 F. Supp. 3d 995,

1014 (S.D. Ohio 2022) (quoting 42 U.S.C. § 2000bb-1(a)).

The County argues that any allegations suggesting it had an employment relationship

with Ms. Curtis "are nothing more than unwarranted inferences" unable to withstand a Rule

12(c) motion.  (ECF Doc. 17, p. 3.)  In support, it cites provisions in the Ohio Constitution, Ohio

Revised Code, Summit County Charter, and Summit County Codified Ordinances which provide

that SCCS and the County are separate government entities, and that the County does not have

legal authority to control or discipline SCCS employees.  (*Id.* at pp. 3-6.)  The County also cites

an Ohio Attorney General opinion finding a county children services board was not under the

control of Summit County.  (*Id.* at p. 6 (citing 194 Ohio Op. Atty. Gen. No. 94-095 (Ohio A.G.),

1994 WL 725890 (Dec. 30, 1994).))  In that opinion, the Ohio Attorney General concluded:

"Ohio Const. art. X, § 3 does not authorize a county to adopt a charter amendment that would

place a . . . county children services board . . . under the legislative control of either the county

executive or the legislative authority of a charter county."  Ohio Op. Atty. Gen. No. 94-095.

Ms. Curtis does not dispute the legal authority cited by the County to show its lack of authority over SCCS and its employees.  She acknowledges that "the County denies certain authority over SCCS," but argues that she has "clearly allege[d] the County manages SCCS." (*Id*. at p. 5 (citing Complaint, ¶ 9).)  In the cited paragraph, Ms. Curtis alleges:

> Defendant County of Summit, Ohio is the official managerial and legal body of Summit County, Ohio. With a charter form of government, it manages over ten (10) departments in addition to overseeing various agencies and divisions, including SCCS. It is one of the largest employers in the county and is headquartered in Akron, Ohio.

(Complaint, p. 2, ¶ 9.)  Given her failure to challenge the authority demonstrating that the County and SCCS are separate government entities, and that the County does not have authority over SCCS's employees, any interpretation of ¶ 9 as alleging an employment relationship between Plaintiff and the County is no more than a legal conclusion couched as factual allegation, which need not be accepted as true.  *See Hensley Mfg*, 579 F.3d at 609.  Based on its review of the Complaint, the Court finds Ms. Curtis has failed to adequately and plausibly allege that the County was her employer, or that it otherwise exercised control over the employment actions challenged in the Complaint.  *See Nelson v. Clermont Cnty. Veterans' Serv. Comm'n*, No. 1:11-CV-335-HJW, 2012 WL 893877, at *4 (S.D. Ohio Mar. 15, 2012) (finding allegations that county was an "employer" were inadequate to state a claim under the ADA and FMLA).

Ms. Curtis also argues the County's focus on its lack of authority "ignores the ultimate questions in this case," which are: "[W]as Plaintiff discriminated against due to her religious beliefs and, if so, who was responsible for the discriminatory practices and policies?"  (ECF Doc. 22, p. 4.)  Even if the County did not have authority to take the challenged actions, Ms. Curtis argues that "does not foreclose all possibility that the County influenced SCCS's mandates and discipline of employees."  (*Id.* at p. 5.)  In particular, she argues that her Complaint "suggests the

10

County was responsible for SCCS's re-institution of a mask mandate" and "states enough to plausibly allege that SCCS may have adopted the County's masking policies which ultimately led to Plaintiff's discriminatory termination." (*Id.* at pp. 5-6 (citing Complaint, ¶¶ 22-23).)

Although Ms. Curtis argues that the allegations in the Complaint "suggest[]" the County was responsible for SCCS instructing its employees to return to mask wearing, and that SCCS "may have" been "adopt[ing] the County's masking policies" (*id.*), the relevant allegations state only that the County and SCCS had *separate* masking mandates, that the County lifted and then reinstituted its own mandate, and that SCCS instructed its employees to return to mask wearing (Complaint, pp. 4-5, ¶¶ 20-23). There is not even a suggestion in this language that SCCS instructed its employees to return to mask wearing *because* the County reinstituted its mandate. More importantly, even if Ms. Curtis had alleged that SCCS reinstituted its mandate because it was following the County's example or "adopt[ing] the County's masking policies," Ms. Curtis has still offered no argument or authority to demonstrate how or why the County would be legally accountable for SCCS's actions in that circumstance, given the legal authority establishing that Defendants are separate legal entities and that the County does not have authority over SCCS's employees.

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. While "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Court finds that Ms. Curtis has failed to plausibly allege – beyond a "sheer possibility – that the County was involved in, or legally responsible for, the alleged conduct that is challenged in Counts I, II, and III of the Complaint. While Ms. Curtis is not required to include "detailed factual allegations," she must

11

provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  Ms. Curtis' conclusory allegations of discriminatory or retaliatory conduct by the County do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Given Ms. Curtis' failure to meet these basic pleading standards, her additional argument that "it is simply too early in the process" to assess whether "the County exerted a culpable level of control here" is not well taken.  (ECF Doc. 22.)

For the reasons set forth above, the County's Motion for Judgment on the Pleadings is **GRANTED** and Plaintiffs claims against the County are dismissed.

### B.      Plaintiff's Request for Leave to Amend Complaint

Having granted the County's Motion, this Court must next consider Ms. Curtis' request in the alternative for leave to amend the Complaint "to assert that her paychecks are issued by the Summit County Fiscal Officer and that her employer is listed as the Summit County Fiscal Officer on her W-2."  (ECF Doc. 22, p. 6.)  With these added allegations, Ms. Curtis argues this case is analogous to *Burkhard v. Henry Soil & Water Conservation Dist.*, No. 3:02CV7428, 2005 WL 1863828 (N.D. Ohio Aug. 3, 2005), where the court found two public entities – a county and a soil and water conservation district – should be aggregated as a "single employer" for Title VII purposes.  (ECF Doc. 22, pp. 2-4.)

The County responds that the proposed allegations would still be inadequate to demonstrate the amount of control over SCCS employees necessary for Title VII liability, consistent with the courts' findings in *Satterwhite v. Ashtabula Cnty. Metroparks*, 514 F. Supp. 3d 1014, 1035 (N.D. Ohio 2021) and *Onuoha v. Greene Cnty. Bd. of Commissioners*, No. 3:15-CV-047, 2015 WL 7820633 (S.D. Ohio Nov. 12, 2015), *report and recommendation adopted,* No. 3:15-CV-47, 2015 WL 7871352 (S.D. Ohio Dec. 3, 2015).  (ECF Doc. 23, pp. 4-5.)

The Federal Rules of Civil Procedure provide that leave to amend should be freely given when justice requires. Fed. R. Civ. P. 15(a)(2). However, a court is not required to grant leave to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737 (6th Cir.), *cert. denied,* 143 S. Ct. 527 (2022) (quoting *Parchman v. SLM Corp*., 896 F.3d 728, 736 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (emphasis in original). For the reasons explained below, the Court finds that amendment as requested by Ms. Curtis would be futile.

Title VII makes it unlawful for an employer to discharge or discriminate against a person with respect to her employment because of her "race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a).[1] An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). "The determination of whether a particular entity is an employer of a Title VII plaintiff involves an examination of whether the alleged employer exercises control over the manner and means of the plaintiff's work." *Sutherland v. Michigan Dept. of Treasury,* 344 F.3d 603, 612 (6th Cir. 2003).

"While direct employment relationships provide the usual basis for liability under Title VII, there are situations where two entities are so interrelated that they may be deemed a common employer for Title VII." *Higgins v. Vitran Exp. Inc.*, No. 1:09CV228, 2009 WL 3873662, at *2 (S.D. Ohio Nov. 18, 2009). An entity that does not meet the definition of

---

[1] Both parties focus their legal arguments exclusively on the Title VII claims set forth in Counts I and II of the Complaint. Since Plaintiff has not proposed to make any amendments to revive the RFRA claim in Count III, that claim is not considered in assessing Plaintiff's request for leave to amend the Complaint.

employer because it does "not formally employ the plaintiff or do[es] not meet the numerosity requirement [] may still face liability through the single-employer or joint-employer doctrines." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011) (citing *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 993 (6th Cir. 1997)).

"Under the single-employer doctrine, 'two nominally independent entities are so interrelated' that all of the employees of one are attributed to the other." *Sanford*, 449 F. App'x at 491 (quoting *Swallows*, 128 F.3d at 993 n. 4).  In contrast, "[t]he joint-employer doctrine involves a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer; unlike in the single-employer context, the two businesses are in fact independent." *Id.*  While the parties in this case use the term "joint employer" in their briefing, their legal arguments primarily focus on cases decided under the "single employer" doctrine.  (ECF Docs. 17, 22, 23.)

The Sixth Circuit has observed that there is some lack of clarity as to the relationship between the "single-employer" and "joint-employer" doctrines.  *Swallows,* 128 F.3d at 993 n. 4.  There is additionally some question regarding the applicable standard for a "single-employer doctrine" analysis in cases where the employers are public subdivisions.  *Compare Satterwhite*, 514 F. Supp. 3d at 1030-31 (applying four-factor test in *Swallows,* 128 F.3d at 993) *with Burkhard*, 2005 WL 1863828, at *2 (applying standard from *Lyes v. City of Rivera Beach, Fla.*, 166 F.3d 1332 (11th Cir. 1999)).  Each standard is briefly outlined below.

As to the "joint-employer doctrine," the Sixth Circuit has held that an entity may be considered "the joint employer of another entity's formal employees" for purposes of liability under federal anti-discrimination laws "if the two 'share or co-determine those matters governing essential terms and conditions of employment.'"  *Sanford*, 449 F. App'x at 492 (quoting *Carrier*

14

*Corp. v. NLRB,* 768 F.2d 778, 781 (6th Cir. 1985)); *see also Nethery v. Quality Care Invs., L.P.,* 814 F. App'x 97, 103 (6th Cir. 2020).  "[M]ajor factors in this determination are the ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance."  *Sanford*, 449 F. App'x at 492.

As to the "single-employer doctrine," the Sixth Circuit has considered the following four factors in assessing whether to treat two *non-governmental* entities as a single employer:

> (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control.

*Satterwhite*, 514 F. Supp. 3d at 1024 (quoting *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362 (6th Cir. 1982)); *Swallows*, 128 F.3d 990, 993–94 (same).  "None of these factors is conclusive, and all four need not be met in every case."  *Swallows*, 128 F.3d at 994 (citation omitted).  However, "control over labor relations is a central concern."  *Swallows*, 128 F.3d at 994; *see also Satterwhite*, 514 F. Supp. 3d at 1024 (explaining that the "central concern driving courts' single-employer analyses is the extent to which the nominal employer exercised control over the named employer's employment decision of which the employee complains").

Although the Sixth Circuit has not addressed whether the same four-factor standard applies when the "single-employer doctrine" is applied to *government* entities, some district courts in the Sixth Circuit have applied a different standard that was adopted by the Eleventh Circuit in *Lyes*, 166 F.3d 1332.  *See Burkhard*, 2005 WL 1863828, at *2; *Beauchamp v. City of Paducah*, No. 5:12-CV-00090-TBR, 2014 WL 2805609, at *3 (W.D. Ky. June 20, 2014; *Dumas v. Hurley Med. Ctr.*, 905 F. Supp. 2d 775, 780 (E.D. Mich. 2012); *Schwarz v. Berrien Springs Police Dep't*, No. 1:98-CV-88, 1999 WL 819639, at *12-13 (W.D. Mich. Aug. 6, 1999); *but see Satterwhite*, 514 F. Supp. 3d at 1030-31 ("[T]he Court is not persuaded that the Sixth Circuit

15

would necessarily adopt *Lyes*, particularly when other circuits approach the issue of aggregating public employers differently from the Eleventh Circuit.").

The *Lyes* court found the four-factor standard did not apply where a party sought to "aggregate two or more *governmental* entities and treat them as a single Title VII 'employer'. . ." 166 F.3d at 1344 (emphasis added).  Instead, the court held:

> [W]hen assessing whether multiple governmental entities are a single "employer" under Title VII, we begin with the presumption that governmental subdivisions denominated as separate and distinct under state law should not be aggregated for purposes of Title VII. That presumption may be rebutted by evidence establishing that a governmental entity was structured with the purpose of evading the reach of federal employment discrimination law. Absent an evasive purpose, the presumption against aggregating separate public entities will control the inquiry, unless it is clearly outweighed by factors manifestly indicating that the public entities are so closely interrelated with respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII.

*Id.* at 1345.  In applying this standard, the *Lyes* court found some factors from the existing four-factor test to be inapplicable, including "common management" and "common ownership or financial control."  *Id.* at 1343.  In contrast, the court found factors such as "interrelation of operations" and "centralized control of labor operations" remained applicable.  *Id.* at 1345.  The court explained that "[u]seful indicia of control may be drawn from the agency context, including: the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party."  *Id.* (internal quotation marks and citations omitted).  The court also observed that all courts applying a "single-employer" doctrine share a "common focus" in that they all "seek to determine who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim."  *Id.* (citing cases).

The three standards above may be summarized as follows.  Under the "joint-employment" doctrine, courts consider whether the entities "'share or co-determine . . . matters

governing essential terms and conditions of employment,'" like "the ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance." *Sanford*, 449 F. App'x at 492 (citation omitted)*.*  Under the Sixth Circuit's four-factor "single-employment" analysis, courts are to consider (1) the interrelation of operations, (2) common management, (3) centralized control of labor relations and personnel, and (4) common ownership and financial control, with "control over labor relations" being "a central concern." *Swallows*, 128 F.3d at 994.  Alternately, under the *Lyes* "single-employment" standard, there is a presumption that public entities should not be aggregated, and the presumption must be "clearly outweighed by factors manifestly indicating that the public entities are . . . closely interrelated with respect to control of the fundamental aspects of the employment relationship," with indicia of control that may include: "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party." 166 F.3d at 1345.

Here, Ms. Curtis argues the Court should apply the *Lyes* standard to find that the County "is sufficiently interrelated with SCCS" for the entities to be aggregated as an employer under Title VII because Plaintiff "can show that her W-2 was issued by the County and that her paychecks are issued from the County's account."  (ECF Doc. 22, p. 4.)  She argues that such a holding is supported by the court's finding in *Burkhard* that a county was an employer under Title VII when it was listed as the employer on the plaintiff's W-2 and the county auditor issued the plaintiffs' paychecks.  (*Id.* at p. 3-4.)  The County argues in response that "managing payroll does not equate to exercising control over an employee."  (ECF Doc. 23, p. 4.)

The plaintiff in *Burkhard* sued his former employer – a soil and water conservation district – and the local county, arguing that the government entities should be aggregated as a

single employer under Title VII.  2005 WL 1863828.  The court acknowledged that the entities

were independent legal bodies, with district employees supervised by and accountable to district

leadership and subject to district personnel policies and pay scales.  *Id.* at *3.  Nevertheless, it

found the plaintiff had "presented significant evidence of interrelation between the District and

the County" under *Lyes* because the county was listed as the plaintiff's employer on his W-2, the

county auditor issued district employee paychecks, and the plaintiff was "listed on his pay stub

as employee number one hundred nineteen (119)."  *Id.*  In further support of this finding, the

*Burkhard* court explained:

> Furthermore, the County plays a significant role in the determination and
> administration of employee benefits. The County Commissioners select the health
> care plan provided to the District's employees, the County's workers'
> compensation policy covers the District, the District's Public Employee Retirement
> System payments and administration is done by the County, and the County
> Commissioners determine what paid holidays the District's employees receive.
> Additionally, Burkhard was required to attend County personnel management
> training sessions. Thus, regarding fundamental aspects of the employment
> relationship, there is significant interrelation between the District and the County.

*Id.* at *4.

The analysis and findings of the *Burkhard* decision were recently discussed at length by

this court in *Satterwhite*, 514 F. Supp. 3d 1014.  The court contrasted the findings in *Burkhard*

with the findings of three other courts within the Sixth Circuit who applied a *Lyes* analysis.  *Id.* at

1027-30 (citing *Burkhard*, 2005 WL 1863828; *Beauchamp*, 2014 WL 2805609; *Dumas*, 905 F.

Supp. 2d 775; *Schwarz*, 1999 WL 819639).  While the decision in *Burkhard* was premised

generally on "significant interrelation" between two entities "regarding fundamental aspects of

the employment relationship" 2005 WL 1863828, at *4, the other courts focused more

specifically on who was in control of "the fundamental aspects of the employment relationship

that *gave rise to the claim*."  *Dumas*, 905 F.Supp.2d at 780-81 (quoting *Lyes*) (emphasis in

*Dumas*); *Beauchamp*, 2014 WL 2805609, at *4 (same); *see also Schwarz*, 1999 WL 819639, at

*16 (finding entities separate "because plaintiffs have presented no evidence that the village and

township exercised control over employees of the police department").

Following a detailed analysis of the decisions applying the *Lyes* standard, the *Satterwhite*

court ultimately was "not persuaded that the Sixth Circuit would necessarily adopt *Lyes*," and

instead applied the Sixth Circuit's four-factor "single-employer" test.  514 F.Supp.3d at 1031.

Applying the four-factor test, the court found:

> At most, Satterwhite's evidence shows that ACMP, a small governmental
> subdivision, relied on Ashtabula County, a much larger governmental subdivision,
> for support in managing payroll, record-keeping, and employee benefit functions.
> The Court agrees with ACMP that Satterwhite's evidence regarding Ashtabula
> County's performance of payroll and human resource functions does not suggest
> that Ashtabula County exerted control over ACMP's allegedly discriminatory
> decision to terminate Satterwhite's employment.

*Id.* at 1032.  The court then went on to apply the *Lyes* standard in the alternative, finding the

decisions in *Beauchamp* and *Dumas* instructive, and *Burkhard* unpersuasive.  *Id.* at 1032-33.

Specifically, the court was "not persuaded that a W-2 employer designation is enough to 'clearly

overcome' the presumption of separation between [government entities]" given the *Lyes* court's

focus on "whether the nominal employer exerted control over the fundamental aspects of the

actual employer's employment decisions that gave rise to the claim."  *Id.* at 1033 (citations

omitted).  The court found the county and its subdivision should not be aggregated as a single

employer under *Lyes* or the four-factor single employer test, explaining:

> While the Court agrees that Satterwhite's evidence demonstrates interrelation
> between Ashtabula County's and ACMP's operations, the Court disagrees that
> Satterwhite's evidence demonstrates that the two were so interrelated that
> Ashtabula County exercised control over ACMP's decision to terminate
> Satterwhite's employment.

*Id.*

Consistent with the analysis in *Satterwhite*, this Court finds an additional allegation that the Summit County Fiscal Officer issued Ms. Curtis' paychecks and was listed as her employer on her W-2 would still be insufficient to establish – even at the pleading stage – that the County is an employer under the "joint-employer" or "single-employer" standards.  Even if the County manages paychecks and W-2s for SCCS, Ms. Curtis has offered neither factual allegations nor legal authority to support a further finding that the County was able to hire, fire, discipline, affect benefits, or direct or supervise her performance under the joint-employer standard.  *See Sanford*, 449, F. App'x at 494.  She has likewise failed to allege or cite legal authority to fully address the "central concern" of the four-factor single-employer standard, that the County exercise "centralized control over labor relations and personnel."  *Swallows*, 128 F. 3d at 994; *see Satterwhite*, 514 F. Supp. 3d at 1024 (explaining central concern is the extent to which the entity "exercised control over the . . . employment decision of which the employee complains").  She has also failed to allege factual grounds or cite legal support for a finding that the County exercised "control of the fundamental aspects of the employment relationship that gave rise to the claim" under the *Lyes* standard.  *Lyes*, 166 F. 3d at 1345; *Satterwhite*, 514 F. Supp. 3d at 1033.  The Court therefore finds that the amendment proposed by Ms. Curtis remains insufficient to state a claim against the County as an "employer" under Title VII.

The *Burkhard* court's findings do not require a different result.  Not only is this Court persuaded by the *Satterwhite* court's criticism of that decision, the Court also observes that the *Burkhard* court did not simply rely on checks and W-2s to support its finding of "significant evidence of interrelation" between the county and its subdivision, but also highlighted the county's significant role with respect to employee benefits (including health care, workers' compensation, retirement, and holidays) and personnel management.  2005 WL 1863828, at *4.

This Court is also unconvinced by Ms. Curtis' argument that it is premature to assess the County's status as a Title VII "employer" at the pleading stage.  She cites no authority for this proposition, which is contrary to existing caselaw.  *See Nelson*, 2012 WL 893877, at *6 ("Plaintiff argues that the Court must decide the 'employer' issue on summary judgment after discovery []. On the contrary, research reflects numerous cases where defendants were dismissed on the ground that they were not the plaintiff's employer as a matter of law, and thus could not be liable for employment discrimination or retaliation claims.") (citing cases).

For the reasons above, the Court finds Ms. Curtis' proposed amendments would be futile because her Title VII claims against the County "still could not withstand a Rule 12(b)(6) motion to dismiss." *Skatemore*, 40 F.4th at 737 (internal quotations and citations omitted).

### IV.    Conclusion

For the reasons set forth above, the Court **GRANTS** the County's Motion (ECF Doc. 17), dismisses Plaintiff's claims against the County of Summit, and **DENIES** Plaintiff's request for leave to file an amended complaint.

August 28, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge